IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO
Judge R. Brooke Jackson

Civil Action No. 17-cv-2974-RBJ

BRADLEY DILTS,

    Plaintiff,

v.

NANCY A. BERRYHILL, Commissioner of Social Security,

    Defendant.

---

## ORDER

---

This matter is before the Court on review of the Social Security Administration ("SSA") Commissioner's decision denying claimant Bradley Dilts's application for disability insurance benefits ("DIB") under Title XVI of the Social Security Act. Jurisdiction is proper under 42 U.S.C. § 405(g). For the reasons below, the Court reverses and remands the Commissioner's decision.

## STANDARD OF REVIEW

A person is disabled within the meaning of the Social Security Act only if his physical and /or mental impairments preclude him from performing both his previous work and any other "substantial gainful work which exists in the national economy." 42 U.S.C. §432(d)(2). To be disabling, a claimant's conditions must be so limiting as to preclude any substantial gainful work for at least twelve consecutive months. *See Kelly v. Chater*, 62 F.3d 335, 338 (10th Cir. 1995).

In reviewing a final decision by the Commissioner, the District Court examines the record and determines whether it contains substantial evidence to support the Commissioner's

decision and whether the Commissioner applied the correct legal standards. *Winfrey v. Chater*, 92 F.3d 1017, 1019 (10th Cir. 1996). The District Court's determination of whether the ALJ's ruling is supported by substantial evidence "must be based upon the record taken as a whole." *Washington v. Shalal*, 37 F.3d 1437, 1439 (10th Cir.). A decision is not based on substantial evidence if it is "overwhelmed by other evidence in the record." *Bernal v. Bowen*, 851 F.2d 297, 299 (10th Cir. 1988). Substantial evidence requires "more than a scintilla, but less than a preponderance." *Wall v. Astrue*, 561 F.3d 1048, 1052 (10th Cir. 2009). Evidence is not substantial if it "constitutes mere conclusion." *Musgrave v. Sullivan*, 966 F.2d 1371, 1374 (10th Cir. 1992). Reversal may also be appropriate if the Commissioner applies an incorrect legal standard or fails to demonstrate that the correct legal standards have been followed. *Winfrey*, 92 F.3d at 1019.

## BACKGROUND

### A. <u>Factual Background.</u>

Mr. Dilts worked as a concrete supervisor, a concrete pointer, and a waterproofing and caulking machine operator. R.36. He was 52 years old on the date of the ALJ's decision, R. 36, which the regulations define as "closely approaching advanced age." 20 CFR § 404.1563(d). Mr. Dilts contends that beginning in February 2014, pain in his neck and back arising from cervical and lumbar disc degeneration and issues with a damaged shoulder and numb hand has prevented him from engaging in substantial gainful employment.

The medical evidence before the ALJ showed that in March 2014, Mr. Dilts first complained of neck, back, and shoulder pain to his primary care provider. R. 318. Over the next two and half years, Mr. Dilts underwent multiple types of diagnostic imaging and tried various treatments including chiropractic care, R. 251, physical therapy, R. 273, a steroid injection in his

shoulder, R. 350, surgery on his shoulder, R.352, and two surgeries on his neck, R. 484-506, 610-12, 640. Mr. Dilts testified that despite these treatments, his conditions have worsened since 2013, and that he continued to experience pain and a lack of mobility that prevented him from working consistently in this time. R. 52-63.

### B. Procedural Background.

Mr. Dilts filed his claim for disability on January 7, 2015 alleging the following conditions: neck pain, compressed discs, a numb hand, neuropathy, an upcoming neck surgery, right arm rotator cuff issues, previous shoulder surgery, a damaged shoulder, and issues with his lower back. R. 94-95. The disability adjudicator determined that though Mr. Dilts's conditions caused pain and fatigue and limited his ability to perform work, they did not prevent him from performing lighter work. R. 104. Accordingly, his claim was denied on March 2, 2015. Following the denial of his claim, Mr. Dilts timely requested a hearing by the Administrative Law Judge (ALJ). R. 74-75. On October 17, 2017 Mr. Dilts appeared and testified before ALJ Jennifer B. Millington in Denver, Colorado. R. 29-37. An impartial vocational expert, Cynthia Ann Bartmann, also appeared at the hearing. R. 29. After the hearing, Mr. Dilts amended the alleged date of onset of his disability from March 5, 2013 to February 18, 2014. R. 29.

### C. The ALJ's Decision.

The ALJ issued a decision denying benefits after evaluating the evidence according to the Social Security Administration's standard five-step process. *See* 20 C.F.R. § 416.920; *see also Allen v. Barnhart*, 357 F.3d 1140, 1142 (10th Cir.2004). First, she found that Mr. Dilts had not engaged in substantial gainful activity from his amended alleged onset date of February 18, 2014 through his date last insured was December 31, 2016. R. 31. At step two, the ALJ found that Mr. Dilts had the following severe impairments: degenerative disc disease of the lumbar spine;

degenerative disc disease of the cervical spine, status post cervical fusion; and obesity. R.31. Mr. Dilts also alleged disability based on a left shoulder injury, testifying that he had difficulty reaching overhead. R.31. The ALJ found that his July 2014 shoulder surgery was effective in addressing his torn shoulder and that the pain in his neck and arms appear to relate to his ongoing cervical spine condition instead. As a result, she concluded that his left shoulder injury was not a severe impairment. R. 32. At step three, the ALJ found that Mr. Dilts did not have an impairment or combination of impairments that met or medically equaled the severity of one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1.

At step four, the ALJ found that Mr. Dilts had the residual functional capacity (RFC) to perform light work except he could only lift or carry a maximum of 10 pounds. Further, for postural limitations, the ALJ found that Mr. Dilts could occasionally climb ramps and stairs, climb ladders, ropes or scaffolds, balance, stoop, kneel, crouch, or crawl. R.32. She did not find manipulative limitations (limitations in reaching, handling, or fingering). The ALJ concluded that Mr. Dilts is unable to perform any past relevant work. R. 35–36. At step five, the ALJ determined that there are jobs that exist in significant numbers in the national economy that Mr. Dilts can perform. A vocational expert testified that a person who could do light work activities but lift a maximum of 10 pounds (instead of the 20 pounds normally associated with light work) and who could occasionally engage in postural activities would be able to perform the requirements of the following occupations: small parts assembler, with 50,000 jobs in the United States; production assembler, with 25,000 jobs in the United State; and bakery conveyor with 30,000 jobs in the United States.[1] R. 36. As a result, the ALJ concluded that Mr. Dilts was not disabled. R. 37.

---

[1] However, the vocational expert estimated a 50% erosion from these usual job numbers for small parts assembler and production assembler to account for Mr. Dilts's 10 lbs lifting and carrying limitation.

4

**DISCUSSION**

Mr. Dilts contends that the ALJ erred in three ways. First, Mr. Dilts argues that the ALJ failed to properly evaluate the medical evidence and medical source opinions in determining the RFC. He takes issue with the limited weight given to Mr. Newman's Med-9 form and the finding of no manipulative limitations. Second, Mr. Dilts argues that the ALJ failed to evaluate Mr. Dilts's subjective complaints of disabling pain as required by law in determining that he had an RFC to perform a range of light work. He contends that his limited daily activities and persistence in finding relief from his pain lend credibility to his testimony that he needs to lie down often during the day and is not able to perform postural activities. Third, he contends that the ALJ reached a conclusion at step five that is unsupported by substantial evidence - an argument that is an extension of arguments one and two. ECF No. 14 at 16. I agree with Mr. Dilts's second argument. Although plaintiff requests a directed award of benefits, I find this case does not represent an appropriate circumstance for the exercise of my discretion in that regard, *see Nielson v. Sullivan*, 992 F.2d 1118, 1122 (10th Cir. 1993), and remand the case.

    A. **Evaluation of the Medical Evidence and Source Opinions in RFC Determination.**

        1) Limited Weight Given to Mr. Newman's Med-9 Form.

Mr. Dilts argues that it was not proper for the ALJ to give Physician Assistant Newman's opinion limited weight on the basis that he "was not an acceptable medical source." R. 34. In August 2014, Mr. Newman completed a Colorado Department of Human Services Med-9 form in which he opined that Mr. Dilts would be disabled for at least 12 months due to chronic cervicalgia. R. 353. The ALJ "gave little weight" to Mr. Newman's statements because "it addresses a different definition of disability than that of the Agency. In addition, Mr. Newman is not an acceptable medical source and addresses an opinion reserved to the commissioner." R.

34. I agree with the Commissioner that these are proper bases for giving limited weight to an opinion.

Regulations state that opinions on issues reserved to the Commissioner are not entitled to special significance as medical opinions. 20 C.F.R. § 404.1527(d). An opinion that the claimant is disabled is one such issue reserved to the Commissioner. The ALJ is responsible for making the determination about whether a claimant meets the statutory definition of disability. 20 C.F.R. 404.1527(d)(1). On similar facts, the Tenth Circuit has held that a physician's statement that he did not know if a claimant would be able to ever return to work "was not a true medical opinion" where it did not contain the doctor's judgment "about the nature and severity of [the claimant's] physical limitations, or any information about what activities [the claimant] could still perform." *Cowan v. Astrue*, 552 F.3d 1182, 1189 (10th Cir. 2008). Here, Mr. Newman's statement that Mr. Dilts would be disabled for at least 12 months is on an issue reserved to the Commissioner, and therefore it is not entitled special significance.

    2) <u>Finding of No Manipulative Limitations.</u>

Mr. Dilts argues that it was an unreasonable reading of the record to conclude that his cervical impairments, combined with his shoulder injury, did not result in any manipulative limitations. Because light jobs "require gross use of the hands to grasp, hold, and turn objects," "any limitation of these functional abilities must be considered very carefully to determine its impact on the size of the remaining occupational base of a person who is otherwise found functionally capable of light work." SSR 83-14 (S.S.A. 1983).

In reaching this conclusion, the ALJ cited Dr. Weingarten's opinion from an August 2016 consultation that Mr. Dilts has no deficits in handling and fingering. However, because the ALJ also stated that she "[gave] limited weight to Dr. Weingarten's opinion because the claimant was

6

only two weeks post surgery at the examination," R. 35, and Dr. Weingarten cautioned that "[t]he physical exam in this assessment is . . . significantly limited[,]" R.369, Mr. Dilts contends that Dr. Weingarten's opinion was insufficient to support a conclusion of no manipulative limitations.

However, Dr. Weingarten's opinion was not the only thing the ALJ relied upon in determining the existence of manipulative limitations. The ALJ noted a number of points in the clinical history that could weigh upon manipulative limitations in her opinion: for example, a finding of no upper extremity motor deficits in April 2016 and Mr. Newman's 2014 report of normal range of motion of Mr. Dilts's arms and legs, though limited range of motion in his neck. In turn, the ALJ also described findings of focal deficits upon sensory testing and motor testing in July 2016, persistent issues with left hand numbness throughout this time period, and a report of left arm numbness with pain and radiation in June 2015. R. 34-35. Mr. Dilts argues that evidence in the record, especially latter medical findings, overwhelms Dr. Weingarten's limited assessment that he didn't suffer from manipulative limitations. ECF No. 14 at 11.

Mr. Dilts highlights the following clinical findings in the record not noted by the ALJ. First, in April 2016, Heather Duncan, a physician assistant with the Colorado Comprehensive Spine Institute found mild atrophy in the muscles of the left hand. R. 531. In June and July 2016, Dr. Gallizi, the surgeon for Mr. Dilts's second neck surgery, also found left grip strength slightly decreased to 4/5 with "thenar wasting." R. 610, 613. The record must demonstrate that the ALJ considered all of the evidence, but an ALJ is not required to discuss every piece of evidence. *Clifton v. Chater*, 79 F.3d 1007, 1009 (10th Cir. 1996). Rather, in addition to discussing the evidence supporting her decision, the ALJ also must "discuss the uncontroverted evidence [the ALJ] chooses not to rely upon, as well as significantly probative evidence [the

7

ALJ] rejects." *Id.* These findings are not "uncontroverted" or "significantly probative," as they describe only "mild" or slightly abnormal findings. The ALJ's discussion of more serious findings such as numbness in the arm and hand, deficits in sensory and motor testing, and limited range of motion are sufficient for me to infer that the ALJ considered all evidence bearing on manipulative limitations.

Mr. Dilts argues that though the medical exams reflected normal strength in his extremities, the clinical findings were more often positive for abnormalities than not. The evidence in the record is split with indicators of sensory deficits in the hand or arm at some points by some medical providers and normal or only slightly abnormal findings at other points by other medical providers. Consistently, Mr. Dilts's testimony at the hearing focused on how pain in his neck and back limited his activities rather than on manipulative limitations. *See, e.g.* R. 53-56 (In response to question from ALJ "Tell me about your medical problems that keep you from working now," Mr. Dilts responds "obviously my neck" . . . "My back is just getting progressively worse," . . . "I'm finding myself laying down a lot"); *but see* 60-61 (in response to question from his attorney Mr. Dilts affirms that he has difficulty reaching overhead and "sometimes my left hand is still numb"). The ALJ cited findings in her RFC determination that accurately reflect Mr. Dilts's experience with various providers and their findings of abnormal and normal manipulative functions. Because the ALJ relied on sufficient relevant evidence in reaching her conclusion, while taking into account relevant contrary evidence, I uphold her finding of no manipulative limitations.

Mr. Dilts also argues that the ALJ's finding that he could perform occasional postural activities was not based on substantial evidence. ECF NO. 14 at 6-11. Because this argument

overlaps with his argument that the ALJ did not properly evaluate his subjective complaints of disabling pain, I will address these issues together below.

### B. Evaluation of Mr. Dilts's Subjective Complaints of Disabling Pain.

Mr. Dilts argues that the ALJ failed to address his subjective pain complaints under the three-step analysis of *Luna v. Bowen*, 834 F.2d 161 (10th Cir. 1987).

> Under *Luna* an ALJ faced with a claim of disabling pain is required to consider and determine (1) whether the claimant established a pain-producing impairment by objective medical evidence; (2) if so, whether the impairment is reasonably expected to produce some pain of the sort alleged (what we term a "loose nexus"); and (3) if so, whether, considering all the evidence, both objective and subjective, the claimant's pain was in fact disabling.

*Keyes-Zachary v. Astrue*, 695 F.3d 1156, 1166–67 (10th Cir. 2012). A Social Security Administration Ruling provides further guidance on how to evaluate statements regarding the intensity, persistence, and limiting effects of symptoms in disability claims. SSR 16-3P (S.S.A. Oct. 25, 2017). Symptoms, including pain, are defined as the claimant's own statement of his physical or mental impairment. *Id.* This guidance describes the process ALJs follow, which ALJ Millington referred to in her decision:

> First, we must consider whether there is an underlying medically determinable physical or mental impairment(s) that could reasonably be expected to produce an individual's symptoms, such as pain. Second, once an underlying physical or mental impairment(s) that could reasonably be expected to produce an individual's symptoms is established, we evaluate the intensity and persistence of those symptoms to determine the extent to which the symptoms limit an individual's ability to perform work-related activities . . . .

*Id.* , R. 32-33.

The Tenth Circuit has emphasized that a reviewing court should give particular deference to an ALJ's evaluation of a claimant's subjective reports of limitations. *Kepler v. Chater*, 68 F.3d 387, 391 (10th Cir. 1995). At the same time an "ALJ 'must articulate specific reasons for questioning the claimant's credibility' where subjective pain testimony is critical." *Id.* (quoting

9

*Marbury v. Sullivan*, 957 F.2d 837, 839 (11th Cir. 1992)). The ALJ is not required to explicitly state "I find this statement not credible" for each factual assertion but can instead list many factual assertions, "often following them by a qualifying statement to indicate where [the ALJ] believed [the claimant's] testimony was contradicted or limited by other evidence in the record." *Keyes-Zachary*, 695 F.3d at 1169.

At his hearing, Mr. Dilts testified that he could sit for about 45 to 60 minutes, stand for about 15 minutes, and walk for about 15 minutes at one time before experiencing pain. R.33. He testified that he could not work a consistent 40 hour per week schedule as he needed to lay down often to manage his pain. R.21. The vocational expert testified that jobs in the light work category could require standing for up to six hours a day, though some could be accommodated with a combination of standing and sitting. R. 71. Mr. Dilts testified that bending over to perform simple household tasks like vacuuming caused him pain. R.62. "Occasional" postural activities would require him to crouch, crawl, kneel, balance or stoop "from very little up to one-third of the time" he is at work. *See* SSR 83-14 (S.S.A. 1983). Here, we have one of those cases where subjective pain testimony is critical.

The ALJ found that "the claimant's medically determinable impairments could reasonably be expected to cause the alleged symptoms; however, the claimant's statements concerning the intensity, persistence and limiting effects of the symptoms are not entirely consistent with the medical evidence and other evidence in the record . . . ." R. 35. Mr. Dilts argues that the ALJ did not explain how she perceived his subjective reports to be inconsistent with the medical evidence or identify what medical findings she relied upon in support of her assessment.

He cites *Brownrigg v. Berryhill*, where the Tenth Circuit reversed an ALJ's pain and credibility analysis in determining an RFC where he examined some of the objective medical evidence and highlighted perceived inconsistencies between the claimant's hearing testimony and statements to medical providers but did not explain his reasons for discounting the claimant's pain allegations. *Brownrigg v. Berryhill*, 688 F. App'x 542, 546 (10th Cir. 2017). Mr. Dilts argues that similarly here, the ALJ should have explained which aspects of Mr. Dilts's testimony she did not believe and why. He contends that the record reflects that he has been persistent in his attempts to find relief from his pain since 2014, has regularly sought medical treatment, and has shown a willingness to try any treatment prescribed. He argues that his testimony about the symptoms he experiences is consistent with medical evidence as to the degree of pain that could be reasonably expected from his medical conditions, and that he has consistently complained of pain to his medical providers, none of whom have suggested Mr. Dilts was exaggerating. I agree that the analysis of the limiting effects of Mr. Dilts's pain, especially his later back and neck pain, and the determination that he can perform occasional postural activities require further explanation or reconsideration.

1) <u>Objective Medical Evidence Weighing Upon Mr. Dilts's Allegations of Pain.</u>

Between February 2014 and the end of 2016, there are a number of clinical findings that are consistent with Mr. Dilts's described symptoms. In June 2014, after having Magnetic Resonance Imaging (MRI) done, Mr. Dilts was examined by Peter Quintero in conjunction with a prior disability application. R. 251. At this exam, Mr. Dilts stated that he was experiencing neck and low back pain. R. 251. Dr. Quintero's examination revealed decreased range of motion of the cervical spine, right shoulder, and lumbosacral spine, but did not observe muscle weakness, abnormal gait, nor abnormal grip strength. Dr. Quintero diagnosed Mr. Dilts with (1)

chronic neck pain secondary to multilevel cervical arthritis, herniated cervical disc and cervical stenosis; (2) chronic right shoulder pain – most likely secondary to rotator cuff tear; and (3) chronic low back pain secondary to degenerative arthritis. R. 254.

After Dr. Quintero's examination, Mr. Dilts underwent another MRI study which revealed tears in the shoulder. R. 355. He underwent shoulder surgery in July 2014. R. 352. Five months later, the orthopedist who performed the shoulder surgery, Dr. Rajesh Bazaz, observed nearly normal shoulder function, and a follow-up MRI of Mr. Dilts's shoulder showed "a little bit of tendinitis" but otherwise normal shoulder functioning. R.446. In his appointment with the orthopedist, Mr. Dilts reported that he was doing well until three weeks prior when he attempted to split wood, further aggravating his right shoulder. R. 350. Dr. Bazaz administered an injection into his shoulder to treat the inflammation. R. 350.

However, during this time of recovery from the shoulder surgery, Mr. Dilts continued to report neck pain. In August 2014, Mr. Dilts presented to his examining clinician, Denis Newman, for a refill of his Norco prescription for his chronic neck pain. R. 289. He requested a consultation for spinal surgery. R. 289. At this appointment, he complained of frequent headaches, fourth and fifth finger numbness, and chronic muscle spasms in his left trapezius muscle. R. 289. In November 2014, Mr. Dilts saw Denis Newman again for a refill of pain medication. R. 276.

In January 2015, Mr. Dilts visited the Neurosurgery Center of Colorado and was evaluated by Family Nurse Practitioner (FNP) Kimberly Sexton. His reports of pain in his left arm and neck and numbness in his hand remained constant. He also reported low back pain going into his legs. R. 273. He had full strength in his lower extremities, although he walked with a slow gait. R. 273. When Mr. Dilts indicated that physical therapy had been ineffective in

relieving his pain, FNP Sexton suggested epidural steroid injections which Mr. Dilts declined. He was referred for a follow up MRI. R. 273.

In March 2015, Mr. Dilts again visited Dr. Newman, reporting shoulder pain, neck pain, fifth finger nerve pain, and dorsal numbness. R. 443. Dr. Newman observed a limited range of motion in his neck. R. 444. In April, Dr. John Oro of the Neurosurgery Center reviewed Mr. Dilts's MRI scan, finding degenerative disks, slight anterolisthesis (spine condition involving slippage of the upper vertebral body) and foraminal narrowing (narrowing of the cervical disc space). R. 476. He discussed the possibility of surgical therapy to relieve pressure on the spinal nerves and vertebral canal or steroid injections as treatment options. R. 477. Mr. Dilts indicated that he was not interested in the injections but would be willing to try surgery. R. 484.

In August 2015, Mr. Dilts had neck surgery. R. 484-506. However, in August and September he continued to report neck pain, left hand numbness, and mid and lower back pain to his primary care provider, Denis Newman, and reported that his narcotic pain medicine was not managing his pain. R. 418, 428. To investigate the source of the back pain, Mr. Newman ordered x-rays of his low and mid back which both showed disc space narrowing, but "no indication for intervention." R 428, 434. He observed an "active painful range of motion" in the cervical spine and lumbar spine, back pain with straight leg raises, and a normal gait. R.435. Mr. Newman and Elizabeth Couture, another physician assistant at the clinic, tapered Mr. Dilts's narcotic pain medications from November 2015 to February 2016, while adding anti-inflammatory medication and gabapentin (medication for nerve pain). R. 428, 433, 436, 440.

In April 2016, Mr. Dilts sought treatment at the Colorado Comprehensive Spine Institute, where a doctor diagnosed Mr. Dilts with kyphotic deformity of his cervical spine with instability "at C4-5 and at C7-T1 flexion/extension." He reported not taking any pain medication at the

time. R.529. He opined that the instability in his cervical spine required an anterior support column and referred Mr. Dilts to Dr. Gallizzi for discussions about surgery. R.532. In August 2016, Mr. Dilts had a second neck surgery where he underwent a posterior fusion using rods, pedicle screws and posterior instrumentation. R. 33, 367, 610-12, 640.

On August 30, 2016, Dr. Peter Weingarten, an orthopedic surgeon, examined Mr. Dilts as part of his disability application. R.367. Because Mr. Dilts was told not to bend or twist in recovering from surgery and was wearing a neck collar, Dr. Weingarten noted that "the physical examination will be significantly limited." R.368. Dr. Weingarten's physical exam noted poor balance and 50% range of motion in the lumbar spine but no muscle atrophy and good strength. R. 368. His reviews of x-rays led him to conclude that Mr. Dilts was experiencing mild to moderate degenerative changes in his thoracic spine, very severe disc space narrowing and moderate degenerative changes in his lumbar spine. R.369. Dr. Weingarten concluded that because the second operation was so recent, it would be 6 to 12 months before a satisfactory assessment of prognosis could be made, and that Mr. Dilts should avoid vigorous activity in the meantime. R. 367. He nonetheless opined that Mr. Dilts could never perform postural activities.

2) <u>The ALJ's Analysis of the Intensity, Persistence and Limiting Effects of Mr. Dilts's Symptoms of Neck and Back Pain.</u>

In her *Luna* analysis, the ALJ states that during 2015, Mr. Dilts reported symptoms of pain in his neck and back, as well as numbness in his left hand and leg to his medical providers. In the next sentence, the ALJ noted that Mr. Dilts declined a steroidal injection as a treatment option on two occasions. R. 33. The Commissioner argues that this fact reflected that Mr. Dilts was not aggressively seeking treatment for his alleged pain, undermining his allegations. I disagree. The record reflects that Mr. Dilts had been administered steroid injections before, and found it to be an ineffective treatment. R. 347, 350, 411, 483 (treating physician stating in

14

reference to a steroid injection to Mr. Dilts's knee that "[i]t makes sense that the steroid injection really did not help his symptoms because I do not really think his symptoms are intra-articular . . . I wonder if they could have some neurologic causation.")

Moreover, on the second occasion where Mr. Dilts declined an injection, the medical provider discussed an injection as well as surgery as a treatment option for his neck, and Mr. Dilts elected to pursue surgery. R. 412. A claimants' choice of one treatment option between two does not suggest that he is unconcerned about his condition nor does a decision to decline a treatment after it proves ineffective. This is especially true in the context of a robust medical record demonstrating Mr. Dilts consistently seeking care. However, it is unclear whether the ALJ weighed the fact that Mr. Dilts declined an injection on two occasions as undermining his allegations of pain in 2015. I remand this issue for further explanation about how the steroid injection weighed in the *Luna* analysis or reconsideration.

In addition to the pain that Mr. Dilts reported in his back during 2015, the ALJ next describes that Mr. Dilts's reported ongoing pain in his neck along with numbness in his hand to his medical provider in June 2015. Weighing against Mr. Dilts's claims of pain was the fact that "[a]n examination revealed full strength in his arms and normal grip strength . . . on August 13, 2015, the claimant had 5/5 strength in all extremities and intact sensation." However, "[o]n June 17, 2015, the claimant had moderate pain with motion in his cervical spine along with tenderness and moderately reduced range of motion in his lumbar spine. He had left arm numbness with pain and radiation with straight leg raising." On September 2015, the ALJ notes that he had an active pain free range of motion in the lumbar spine, and a normal gait, balance, and motor skills, and that a few months later x-rays showed only mild spondylosis and disc space narrowing. R.34.

15

However, the ALJ also describes how two months later, the claimant visited the emergency room, and reported neck, right arm, low back, and right leg pain again. She describes how an MRI of his cervical spine in March 2016 revealed "multilevel disc degeneration," "a broad based disc bulge with significant stenosis," "a broad based disc bulge causing significant central stenosis effacing the anterior CSF space with left uncovertebral joint hypertrophy and moderate left foraminal stenosis," and "severe disc degeneration with right focal paracentral disc bulge." R. 34. She describes how an MRI of his lumbar spine taken at the same time shows "disc degeneration," mild lateral and bilateral "recess stenosis," "mild to moderate bilateral foraminal stenosis," and "contact of bilateral exiting L5 nerve roots." R. 34.

This imaging is consistent with claimant's allegations of debilitating pain that could limit his postural activities or ability to stand for extended periods of time. However, there was no explanation of how the results of imaging studies were weighed against Mr. Dilts's previous clinical findings of normal balance, gait and motor skills. The ALJ also describes how in April 2016, Mr. Dilts complained of pain in his neck and low back, but at this time the claimant had no upper extremity motor deficits and though he walked with an antalgic gait, had no motor deficits in his legs and negative straight leg test results. R. 35. However, the ALJ does not describe how normal findings in the extremities were weighed against Mr. Dilts's allegations of severe neck and back pain.

There was also no explanation of how the ALJ weighed normal clinical findings against the July 2016 abnormal clinical findings of "abnormal gait, painful range of motion in the claimant's neck, and focal deficits upon sensory and motor testing." R.35. This is especially necessary as the ALJ discussed that contemporaneous x-rays showed "severe degenerative disc

disease at multiple levels of his cervical spine," R. 35, and because these findings are consistent with plaintiff's testimony that his condition was worsening over time.

Mr. Dilts also takes issue with the fact that the ALJ did not mention Mr. Dilts's daily activities, in this analysis. R. 56-57. Factors under the regulations relevant to the determination of the intensity, persistence and limiting effects of an individual's symptoms include:

> (i) Daily activities; (ii) The location, duration, frequency, and intensity of your pain or other symptoms; (iii) Precipitating and aggravating factors; (iv) The type, dosage, effectiveness, and side effects of any medication you take or have taken to alleviate your pain or other symptoms; (v) Treatment, other than medication, you receive or have received for relief of your pain or other symptoms; (vi) Any measures you use or have used to relieve your pain or other symptoms (e.g., lying flat on your back, standing for 15 to 20 minutes every hour, sleeping on a board, etc.); and (vii) Other factors concerning your functional limitations and restrictions due to pain or other symptoms.

20 C.F.R. §§ 404.1529(c)(3), 416.929(c)(3); SSR 16-3P, 2017 WL 5180304, *7-8. An ALJ does not need to engage in a formalistic factor-by-factor analysis. *Poppa v. Astrue*, 569 F.3d 1167, 1171 (10th Cir. 2009). Instead, an ALJ should discuss those factors that are "relevant to the case." SSR 16-3P, 2017 WL 5180304, *7-8. Here, Mr. Dilts reported that he was limited to making simple meals occasionally, had difficulty doing laundry and grocery shopping, and that he experienced pain in bending over to dress himself or to put food in his dog's bowl. R. 214-22, R. 56-57. Mr. Dilts's daily activities are relevant to the case as they weigh upon his ability to perform postural activities. Thus, an explanation was warranted as to if or how his daily activities were evaluated in determining the RFC.

I remand to the ALJ with instructions to reconsider or explain further her determinations of the persistence, intensity and limiting effects of Mr. Dilts's pain with respect to the above points, and to reconsider her determination of Mr. Dilts's ability to perform occasional postural activities.

17

C. **Does Substantial Evidence Support the RFC Determination at Step Five?**

Mr. Dilts's third argument is a continuation of arguments one or two. When a claimant successfully meets their burden through step four, "the burden of proof shifts to the Commissioner at step five to show that the claimant retains a sufficient RFC to perform work in the national economy, given [his] age, education, and work experience." *Wells v. Colvin*, 727 F. 3d 1061, 1064 n.11 (10th Cir. 2013) (citations omitted). Mr. Dilts argues that because the RFC determination was flawed, an imprecise hypothetical was posed to the vocational expert so that her testimony did not provide support for the Commissioner's decision. If the ALJ changes her RFC determination after reconsideration, I ask that she conduct a step five analysis based on Mr.Dilts's vocational profile and RFC, and if necessary, to obtain additional testimony from a vocational expert for this task.

## ORDER

For the reasons described above, the Court REVERSES and REMANDS the Commissioner's decision denying Mr. Dilts's application for disability insurance benefits, and instructs the ALJ to reconsider her decision or provide further explanation in accordance with the dictates of this order.

DATED this 18th day of December, 2018.

BY THE COURT:

_____
R. Brooke Jackson
United States District Judge